UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN THE MATTER OF
THE EXTRADITION OF
HAROLD HOUCK

Case No. 6:26-mj-1982
**FILED UNDER SEAL**

**COMPLAINT**
**(18 U.S.C. § 3184)**

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligation to the Principality of Liechtenstein ("Liechtenstein").

2. There is an extradition treaty in force between the United States and Liechtenstein. *See* Extradition Treaty Between the United States of America and the Principality of Liechtenstein, U.S.-Liech., May 20, 1936, 50 Stat. 1337 (the "Treaty").

3. Pursuant to the Treaty, the Government of Liechtenstein has submitted a formal request through diplomatic channels for the extradition of Harold HOUCK so that HOUCK may serve a sentence for attempted grand coercion, in violation of sections 15, 105(1), and 106(1)(1) of the Liechtenstin Strafgesetzbuch Criminal Code ("LSCC").

4. According to the information from the Government of Liechtenstein, on July 30, 2003, HOUCK was convicted in the Princely Court of Justice of attempted grand extortion and sentenced to three years' imprisonment. HOUCK

appealed to the Princely Court of Appeal, which changed the sentence, based on the same facts, to one year of imprisonment for the offense of attempted coercion. The Office of the Princely Prosecutor appealed to the Princely Supreme Court in Vaduz, Liechtenstein, which on February 5, 2004, revised the sentence to three years' imprisonment for the offense of attempted grand coercion, in violation of LSCC sections 15, 105(1) and 106(1)(1).

5. The offense was committed within the jurisdiction of Liechtenstein. On September 7, 2004, the Princely Court of Justice issued an international arrest warrant for HOUCK, which remains outstanding. HOUCK's conviction, and the ensuing extradition request from Liechtenstein, arise from facts including the following:

a. On January 16, 1987, Lita McClinton Sullivan ("McClinton") was fatally shot at her front door in Buckhead, Georgia, by a man disguised as a flower deliveryman. A criminal investigation commenced against McClinton's then-estranged husband, James Sullivan.[1]

---

[1] Sullivan was not charged with the murder until 1998, after Belinda Trahan came forward and informed authorities that Sullivan had hired Trahan's ex-boyfriend, Anthony Harwood, to kill McClinton. *See Sullivan v. State*, 284 Ga. 358, 358, 667 S.E.2d 32, 34 (2008). Harwood later confessed and in 2003 pleaded guilty to voluntary manslaughter. *Id.* at 359, 667 S.E.2d at 34. After hearing of Harwood's arrest, Sullivan, who was living in Costa Rica at the time, fled to Thailand, which extradited Sullivan to the United States in 2004. *Id.* at 359, 667 S.E.2d at 35. In 2006, a jury found Sullivan guilty of murder. *Id.* at 359–60, 667 S.E.2d at 35.

b. In 1991, McClinton's parents brought a civil action against Sullivan and were awarded $4 million in damages for the wrongful killing of their daughter. Sullivan hired Andreas Schurti, a managing partner of Walpart Trust in Vaduz, to create and manage a Liechtenstein trust on Sullivan's behalf.

c. McClinton's parents hired an attorney in the United States to execute the civil judgment against Sullivan. The attorney's private investigator recruited HOUCK as a financial investigator to help locate and collect assets Sullivan was hiding.

d. In mid-December 2002, HOUCK began making calls and sending letters to Schurti, instructing Schurti to transfer funds from the trust that Schurti was managing on Sullivan's behalf.

e. On December 17, 2002, HOUCK, purporting to be Sullivan, sent a fax to Schurti dated December 16, 2002. In this fax, HOUCK instructed Schurti to transfer all the assets in the trust, except for $50,000, to an account opened the day before under the name "Sullivan Import -Export Holding Ltd. and James V. Sullivan." Schurti did not respond.

f. On December 20, 2002, HOUCK telephoned Schurti, utilizing the alias "Erik," and asked Schurti to comply with the instructions in the fax previously sent. After this call, HOUCK re-sent the fax with additional documents and an accompanying letter that he signed as "Erik."

g. Sometime later that same day, HOUCK telephoned Schurti again, purporting to be "Erik." HOUCK stated that he had a duty to ensure that anyone who failed to carry out the instructions would be killed. HOUCK also threatened that non-compliance with his instructions would be fatal for both Sullivan and anyone who failed to comply.

h. In January 2003, Schurti learned that "Sullivan Import-Export Holding Ltd." did not exist, and Schurti concluded that Sullivan had not sent the fax.

i. On February 25, 2003, HOUCK visited Schurti's residence when Schurti was not home. HOUCK left a message with the housemaid that stated, "DR. SCHURTI – I WAS AT YOUR HOME – ERIC – YOU HAVE WONDERFUL CHILDREN." Schurti learned of this message upon his return from a trip with his family on March 2, 2003.

j. On March 4, 2003, HOUCK contacted Schurti once again by telephone, purporting to be "Erik Michaels." HOUCK referred to the faxes and telephone calls of December 2002 and to his February 2003 "visit" to Schurti's home, and HOUCK threatened that if Schurti failed to transfer the funds as instructed, HOUCK would kill Schurti's wife or set Schurti's house on fire. HOUCK also told Schurti that HOUCK's friends in Paris were monitoring Schurti's house, that HOUCK had inspected Schurti's home and met the maid, and that HOUCK could have killed the maid had he wished to do so.

k. Schurti reported the events to the Liechtenstein Police and hired a security company to protect his family and his home.

l. On March 20, 2003, HOUCK re-sent the December 20, 2002, fax, to which he added, "THIS IS OUR LAST POLITE REQUEST."

m. In the following days, HOUCK had several phone conversations with Schurti, in which he continued urging Schurti to transfer the assets in the trust. Schurti was ultimately able to lure HOUCK to a meeting spot in Zurich, Switzerland. More specifically, on May 9, 2003, Schurti met with HOUCK and his associate, John Wilkes, in Zurich, where the Zurich Cantonal Police arrested HOUCK and Wilkes pursuant to an international arrest warrant from Liechtenstein. From HOUCK's person, Swiss police seized a forged California driver's license in the name of "Erik T. Michaels." Additionally, from HOUCK's luggage at the Hotel Dolder, Swiss police seized a gas pistol, four knives, and a club. HOUCK subsequently consented to extradition to Liechtenstein, where he was convicted and sentenced.

o. HOUCK was detained throughout his criminal proceedings in Liechtenstein, and he participated in his trial. HOUCK was released from custody in Liechtenstein on October 5, 2003.

p. On July 6, 2004, pursuant to a request from the Government of Liechtenstein for mutual legal assistance, U.S. law enforcement agents in Florida

served HOUCK with a summons from Liechtenstein authorities to appear in Lichtenstein to serve his sentence.

q. HOUCK failed to appear in Liechtenstein to serve his sentence, and the Princely Court of Justice in Liechtenstein issued an international arrest warrant for him on September 7, 2004.

r. On October 22, 2022, French authorities arrested HOUCK in Roissy Airport in France pursuant to an international arrest warrant from Liechtenstein. French authorities did not keep HOUCK detained, and HOUCK traveled to the United States by August 2023.

6. According to U.S. law enforcement, HOUCK is located within the jurisdiction of this Court, at 10633 Sunrise Terrace Dr., Orlando, Florida, which is located within the Middle District of Florida.

7. Lara Berlin, an attorney in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty. The declaration states that the Treaty covers the offense for which the Government of Liechtenstein seeks extradition, and it confirms that the documents supporting the request for extradition are properly certified in accordance with 18 U.S.C. § 3190 to enable them to be received into evidence.

8. The declaration from the U.S. Department of State with its

attachments, including copies of the Treaty and the diplomatic note from Liechtenstein, and the certified documents submitted in support of the request (collectively, Government's **Exhibit 1**) are filed with this complaint and incorporated by reference herein.

9. HOUCK likely would flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the fugitive's arrest issue in accordance with 18 U.S.C. § 3184 and the Treaty, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

Respectfully submitted,

Sarah Megan Testerman
Assistant United States Attorney

Sworn to before me and signed in my presence this 20th day of August, 2026.

HON. ROBERT M. NORWAY
United States Magistrate Judge